RUSSELL E. SMITH, District Judge, concurs in the result.

**COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,**

v.

**CO PETRO MARKETING GROUP, INC., a California corporation; Harold D. Goldstein; and Michael Bradley Krivacek, Defendants-Appellants.**

No. 80–5370.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1981.

Decided June 28, 1982.

---

Anthony Murray, Ball, Hunt, Hart, Brown & Baerwitz, Long Beach, Cal., for defendants-appellants.

David R. Merrill, Washington, D. C., argued, for plaintiff-appellee; Gregory C. Glynn, Washington, D. C., on brief.

Before CANBY and NORRIS, Circuit Judges and SMITH,* District Judge.

CANBY, Circuit Judge:

Co Petro Marketing Group, Inc., and individual appellants, Harold Goldstein and Michael Krivacek,[1] (Co Petro) appeal from an

---

* The Honorable Russell E. Smith, United States District Judge, for the District of Montana, sitting by designation.

1. At the onset of this litigation, Harold Goldstein was the sole shareholder and a director of Co Petro. Michael Krivacek was president of Co Petro.

order of the district court, 502 F.Supp. 806, permanently enjoining them from offering, selling, or otherwise engaging in futures contracts in petroleum products, in violation of §§ 4 and 4h of the Commodity Exchange Act, as amended, (the Act), 7 U.S.C. §§ 6, 6h (1976). Co Petro contends that the contracts it sold were not subject to the Act. Co Petro also appeals from the district court's award of relief ancillary to the permanent injunction. The district court appointed a receiver, ordered Co Petro to permit the receiver access to the firm's books and records, ordered an accounting, and generally ordered the disgorgement of unlawfully obtained funds. Co Petro further assigns as error the district court's taking judicial notice of three prior proceedings against defendant Goldstein. We affirm the district court's judgment that Co Petro was offering and selling "contracts of sale of a commodity for future delivery" (futures contracts) within the meaning of section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976). We also agree with the district court that Co Petro violated sections 4 and 4h of the Act, 7 U.S.C. §§ 6, 6h (1976), by trading these contracts otherwise than by or through a member of a board of trade which has been designated by the Commodity Futures Trading Commission as a contract market. Finally we affirm the award of ancillary relief and find no error in the district court's taking judicial notice of the three prior proceedings against defendant Goldstein.

## FACTS

Co Petro is licensed by the State of California as a gasoline broker. It operated a chain of retail gasoline outlets and also acted as a broker of petroleum products, buying and reselling in the spot market several hundred thousand gallons of gasoline and diesel fuel monthly. While part of its business operations involved the direct sale of gasoline to industrial, commercial, and retail users of gasoline[2], Co Petro also offered and sold contracts for the future purchase of petroleum products pursuant to

an "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel" (Agency Agreement).

Under the Agency Agreement, the customer (1) appointed Co Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) paid a deposit based upon a fixed percentage of the purchase price. Co Petro, however, did not require its customer to take delivery of the fuel. Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf. If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit. If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer. A liquidated damages clause provided that in no event would the customer lose more than 95% of his initial deposit.

Co Petro marketed these contracts extensively to the general public through newspaper advertisements, private seminars, commissioned telephone solicitors, and various other commissioned sales agents. The Commodity Futures Trading Commission brought this statutory injunctive action under section 6c of the Act, 7 U.S.C. § 13a–1 (1976), seeking to enjoin Co Petro's sales of petroleum products pursuant to its Agency Agreements. The Commission's complaint generally charged and the district court held that Co Petro was in violation of the Act by offering and selling contracts of sale of commodities for future delivery outside of a licensed contract market.

## NATURE OF THE AGENCY AGREEMENT

Co Petro contends that the Commission lacks jurisdiction over transactions pursuant to its Agency Agreements because these agreements are "cash forward" con-

---

**2.** This portion of Co Petro's business activities is not at issue.

tracts expressly excluded from regulation by section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976). While section 2(a)(1) provides the Commission with regulatory jurisdiction over "contracts of sale of a commodity for future delivery,"[3] it further provides that the term future delivery "shall not include any sale of any cash commodity for deferred shipment or delivery." Cash commodity contracts for deferred shipment or delivery are commonly known as "cash forward" contracts, while contracts of sale of a commodity for future delivery are called "futures contracts". See H.R.Rep.No.93–975, 93d Cong., 2d Sess. 129–30 (1974). The Act, however, sets forth no further definitions of the term "future delivery" or of the phrase "cash commodity for deferred shipment or delivery." The statutory language, therefore, provides little guidance as to the distinctions between regulated futures contracts and excluded cash forward contracts and, to our knowledge, no other court has dealt with this question. Where the statute is, as here, ambiguous on its face, it is necessary to look to legislative history to ascertain the intent of Congress. See United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Our examination of the relevant legislative history leads us to conclude that the Co Petro's Agency Agreements are not cash forward contracts within the meaning of the Act.

The exclusion for cash forward contracts originated in the Future Trading Act, Pub. L.No.67–66, § 2, 42 Stat. 187 (1921). Congress passed the Future Trading Act as a result of excessive speculation and price manipulations occurring on the grain futures markets. S.Rep.No.212, 67th Cong., 1st Sess. 4–5 (1921). See S.Rep.No.93–1131,

93d Cong., 2d Sess. 13 (1974), reprinted in [1974] U.S.Code & Ad.News 5843, 5854–55. To curb these abuses, the Future Trading Act imposed a prohibitive tax on all futures contracts with two exceptions. Section 4(a) of the Act exempted from the tax future delivery contracts made by owners and growers of grain, owners and renters of land on which grain was grown, and associations of such persons. 42 Stat. 187. Section 4(b) of the Act exempted from the tax future delivery contracts made by or through members of boards of trade which had been designated by the Secretary of Agriculture as contract markets. Id. During hearings on the bill that became the Future Trading Act, various witnesses expressed concern that the exemption for owners and growers of grain, owners and renters of land on which grain was grown, and associations of such persons, was too narrow. By its terms, this section might not exempt from the tax a variety of legitimate commercial transactions, such as cash grain contracts between farmers and grain elevator operators for the future delivery of grain. Hearings on H.R. 5676 Before the Senate Committee on Agriculture and Forestry, 67th Cong., 1st Sess. 8–9, 213–214, 431, 462 (1921). As a result, the Senate added language to section 2 of the bill, excluding "any sale of cash grain for deferred shipment" from the term "future delivery".[4] S.Rep.No.212, 67th Cong., 1st Sess. 1 (1921). There is no indication that Congress drew this exclusion otherwise than to meet a particular need such as that of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller.[5] These cash forward contracts

---

**3.** "Contract of sale" is defined as "sales, agreements of sale, and agreements to sell." 7 U.S.C. § 2 (1976). "Commodity" is broadly defined to include, inter alia, "all other goods and articles ..., and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." Id. Co Petro does not dispute that its Agency Agreements were contracts of sale of commodities as defined by section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976).

**4.** The House added the words "or delivery" after the word "shipment." H.R.Rep.No.345, 67th Cong., 1st Sess. 7 (1921).

**5.** Representative Tincher, sponsor of the House version of the bill that became the Future Trading Act explained: "The present bill limits the buying of futures, and absolutely to those who are regularly engaged in the grain or milling business.... He can sell the grain but he must be in the business and he must actually contemplate the delivery of the grain.... [T]his bill does not interfere with them [elevator men] at all." Hearings on H.R. 168, 231,

guarantee the farmer a buyer for his crop and provide the buyer with an assured price. Most important, both parties to the contracts deal in and contemplate future delivery of the *actual* grain.[6]

The exclusion was carried forward without change into the Grain Futures Act, Pub.L.No.67–331, § 2, 42 Stat. 998 (1922).[7] In 1936, Congress enacted the Commodity Exchange Act, Pub.L.No.74–675, 49 Stat. 1491 (1936). This Act expanded the scope of federal regulation to include certain specified commodities in addition to grain, *id.*, § 3, and reworded the exclusion to except "any cash commodity for deferred shipment or delivery." *Id.*, § 2. The Commodity Exchange Act also deleted the express exemption for owners and growers of grain, owners and renters of land, and associations of such persons. Congress considered the exemption redundant since section 2 of the Act, which excluded cash commodity contracts for deferred shipment or delivery, served to protect the same interests that had been protected by the exemption for owners and growers. H.R.Rep.No. 421, 74th Cong., 1st Sess. 4–5 (1935). Although the Act has been amended numerous times since 1936, the language excluding cash commodities for deferred shipment or delivery has remained the same.

A more recent House Report on the 1974 Amendments to the Act reconfirms the narrowness of the exclusion. H.R.Rep.No.93–975, 93d Cong., 2d Sess. 129–30 (1974). The House Report describes a typical cash transaction as involving, for example, a farmer who wants to convert 5,000 bushels of wheat into cash. He seeks a buyer such as a grain elevator for whom the wheat has "inherent value." The wheat has "inherent value" for the grain elevator because the elevator "is in contact with potential buyers such as the flour miller, and has the facilities to store, condition, and load out the grain and earn additional income from these services." *Id.* at 129. The wheat also has "inherent value" to the flour miller, who can increase its utility and value by grinding it into flour. *Id.* A cash forward contract is common in these kinds of transactions because it guarantees the miller, for example, a price but allows delivery to be deferred "until such time as he could process the wheat." [8] *Id.* This House Report therefore supports prior history indicating that a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity.

The situation for which the exclusion for cash forward contracts was designed is not present here. Co Petro's Agency Agreement customers were, for the most part, speculators from the general public. The underlying petroleum products had no inherent value to these speculators. They had neither the intention of taking delivery nor the capacity to do so. Yet it was to the general public that Co Petro made its strongest sales pitches. For example, in an

---

*2238, 2331, 2363 and 5228 Before the House Committee on Agriculture*, 67th Cong. 1st Sess. 8, 16 (1921).

**6.** In the Senate floor debate on the legislation, Senator Capper, the sponsor of the Senate version of the bill, explained: "[T]he bill does not concern itself at all with the sale or purchase of *actual grain*, either for present or future delivery. The entire business of buying and selling the *actual grain*, sometimes called 'cash' or 'spot' business, is expressly excluded. It deals only with the 'future' or 'pit' transaction in which the transfer of actual grain is not contemplated." 61 Cong.Rec. 4762, 67th Cong., 1st Sess. (Aug. 9, 1921). *See Hearings on H.R. 168, 231, 2238, 2331, 2363 and 5228 Before the House Committee on Agriculture*, 67th Cong., 1st Sess. 24 (1921).

**7.** In *Hill v. Wallace*, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922), the Supreme Court declared the Future Trading Act unconstitutional as an impermissible attempt at regulation through the taxing power. Four months later, Congress passed the Grain Futures Act pursuant to the commerce clause. Rather than imposing a tax, the Act generally prohibited the offer or sale of grain for future delivery. Otherwise, there were no material changes from the Future Trading Act. H.R.Rep.No.1095, 67th Cong., 2d Sess. 3 (1922).

**8.** A flour miller also might enter into a cash forward contract with a baker to deliver flour when the baker could put it to immediate use, thereby obviating the need for the baker to maintain storage facilities. H.R.Rep.No.93–975, 93d Cong., 2d Sess. 130 (1974).

advertisement in the Los Angeles Times under the headline "Invest in Gasoline," Co Petro stated: "The Sophisticated Small Investor Can Make Money Buying Gasoline. It's a high risk—high potential yield opportunity." In addition to advertising extensively in newspapers of general circulation, Co Petro ran seminars to explain its investment vehicle to the general public.[9] It also hired sales agents experienced in marketing commodities to investors.[10] In an apparent attempt to protect itself, Co Petro required the investor in one version of its Agency Agreement to initial the following statement: "I realize that a motor vehicle fuel purchase is a high risk speculative venture and I fully understand that I could lose most or all of my entire deposit and by virtue of my own business experience or independent advice, I am capable of evaluating the hazards and merits of this motor vehicle fuel purchase."

■ There is nothing in the legislative history surrounding cash forward contracts to suggest that Congress intended the exclusion to encompass agreements for the future delivery of commodities sold merely for purposes of such speculation. Congress has recognized the vital role speculators play in the proper functioning of futures markets, H.R.Rep.No.93–975, *supra*, at 138, and has expressed its desire to protect speculators through expansive federal regulation. *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, —— U.S. ——, ——, 102 S.Ct. 1825, 1845, 72 L.Ed.2d 182 (1982). Prior to the 1974 Amendments to the Act, only certain specified commodities were regulated. In 1974, Congress not only expanded the list of commodities subject to regulation, but also extended regulation to "all other goods and articles, . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt with." 7 U.S.C. § 2 (1976).

The House Report on these amendments stated: "There is no reason why a person trading in one of the currently unregulated futures markets should not receive the same protection afforded to those trading in the currently regulated markets." H.R. Rep.No.93–975, *supra*, at 76. *See* S.Rep.No. 93–1131, *supra*, at 19. This recent expression of legislative intent to protect persons like Co Petro's customers, who deal in previously unregulated commodity futures, is consonant with a narrow reading of the exclusion for sales of cash commodities for deferred shipment or delivery. We hold, therefore, that this exclusion is unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future. *See In re Stovall*, [Current] Commodity Futures Law Reports (CCH) § 20,941 at 23, 778 (Dec. 6, 1979).

This does not end our inquiry, however. Even though Co Petro's Agency Agreements do not fall within the exclusion for cash forward contracts, there remains the question whether they are "contracts of sale of a commodity for future delivery" (futures contracts) within the meaning of section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976). Co Petro contends that its Agency Agreements cannot be futures contracts because they lack most of the common distinguishing features of futures contracts as they are known in the industry. Futures contracts traded on the designated markets have certain basic characteristics. Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite

---

**9.** For example, advertisements ran in the Denver Post and the San Francisco Examiner. Under the heading INVESTORS, the advertisements stated: "Gas is going sky high . . . Find out why and how you can profit from it. Come to our special seminar."

**10.** Co Petro ran an advertisement in the Los Angeles Times seeking sales agents. It stated in part: "If you are a seasoned experienced telephone pro, we'll show you how you can make top earnings every week. Fresh leads daily from our display ads in L.A. Times Business Section."

contracts. The price differential between the opposite contracts then determines the investor's profit or loss. *See Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1157 (8th Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); H.R.Rep.No.93–975, *supra*, at 130.

■ While contracts pursuant to Co Petro's Agency Agreements were not as rigidly standardized as futures contracts traded on licensed contract markets, neither were they individualized. Tables furnished by Co Petro to its sales agents demonstrate uniformity in the basic units of volume, multiples of which were offered for sale.[11] Similarly, relevant dates in Co Petro's Agency Agreements were uniform. The date on which an investor had to notify Co Petro of his intent to take delivery or appoint Co Petro as his agent to resell the contract was set at approximately eight months from the purchase date. An investor could not give notice prior to the specified notice date. The delivery date was always ten months from the purchase date.

More important, however, than the degree to which Co Petro's Agency Agreements conform to the precise features of standardized futures contracts is the rationale for standardization in futures trading.

Standardized form contracts facilitate the formation of offsetting or liquidating transactions. The ability to form offsetting contracts is essential, since investors rarely take delivery against the contracts.[12] Pursuant to provisions in Co Petro's Agency Agreements, Co Petro was obliged to perform an offsetting service for its customers by reselling contracts for their accounts. Customers also could liquidate their positions in the face of adverse price movements by cancelling their contracts with Co Petro and paying only the liquidated damages provided for in the Agency Agreements.[13] Therefore, Co Petro's customers, like customers who trade on organized futures exchanges, could deal in commodity futures without the forced burden of delivery. Disregarding form for substance, *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), we find without merit Co Petro's argument that its Agency Agreement represents a radical departure from the classic elements of a standardized futures contract. We also reject Co Petro's final contention that, contrary to the practice in organized futures markets where price is established by public auction, it negotiated prices directly with its Agency Agreement customers. The evidence indicates that, for the most part, Co

11. One such table provided as follows:

| PRODUCT | TANKS | GALLONS | PER GALLON | DEPOSIT AMOUNT |
|---|---|---|---|---|
| Unleaded gasoline | 2 (minimum) | 17,600 | 20 cents | $3,520 |
| Unleaded gasoline | 6 | 52,800 | 20 cents | 10,560 |
| Diesel No. 2 | 2 (minimum) | 17,600 | 25 cents | 4,400 |
| Ethanol | 2 (minimum) | 17,600 | 25 cents | 4,400 |
| Heating Oil No. 6 | 1,000 barrels | 42,200 | 25 cents | (by quotation) |

12. H.R.Rep.No.93–975, 93d Cong., 2d Sess. 129 (1974) (actual delivery less than 3%).

13. This procedure is somewhat analogous to a "stop loss" order under which an open futures contract is to be liquidated if the price of the underlying commodity falls below a certain level. While it is true that unlike organized exchange trading, Co Petro's customers were not subject to "margin-calls," those who trade futures on organized markets may similarly limit their liability through resort to "stop-loss" orders. Consequently, we do not find the absence of margin-calls to be a critical distinction.

Petro unilaterally set prices for its products according to the then-prevailing market rates, with the spot market determining resale prices to subsequent purchasers. Moreover, the fact that public auction did not determine Co Petro's prices is merely a result of Co Petro's failure to seek Commission licensing for organized exchange trading in petroleum futures.

In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the Commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose. The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation. Addressing these circumstances in the light of the legislative history of the Act, we conclude that Co Petro's contracts are "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2 (1976).

## VIOLATIONS OF SECTIONS 4 AND 4h OF THE ACT

■ We further decline to accept Co Petro's contention that sections 4 and 4h of the Act, 7 U.S.C. §§ 6, 6h (1976), have no application to its activities. We note first that Co Petro did not properly raise this contention in district court. Normally an appellant may not present arguments in the Court of Appeals that it did not properly raise below, *Rothman v. Hospital Service*, 510 F.2d 956, 960 (9th Cir. 1975), but application of that rule is discretionary with the appellate court. *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). It is well-settled in this circuit that where the new issue is purely a legal one, the injection of which would not have caused the parties to develop new or different facts, it is proper to resolve it on appeal. *Hansen v. Morgan*, 582 F.2d 1214, 1218 (9th Cir. 1978); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). Because the question here is purely of statutory construction that is both central to this case

and important to the public, we exercise our discretion to decide it.

■ Section 4 of the Act, 7 U.S.C. § 6 (1976), makes it "unlawful for any person to deliver ... any offer to make ... any contract of sale of commodity for future delivery *on or subject to the rules of any board of trade* in the United States, or ... to make or execute such contract of sale, ... except ... where such contract is made by or through a member of a board of trade which has been designated by the Commission as a 'contract market.'" (emphasis added). Co Petro contends that even if it were selling commodity futures contracts, the statutory language demonstrates that section 4 only prohibits transactions in futures contracts which currently are on or subject to the rules of a commodity exchange, as that institution is commonly understood. The statutory definition of "board of trade," however, is broad enough to encompass Co Petro's activities here. Section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976), defines "board of trade" to "include or mean any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling commodity or receiving the same for sale on consignment." Where Congress has, as here, intentionally and unambiguously drafted a particularly broad definition, it is not our function to undermine that effort. *Consumer's Union v. Heimann*, 589 F.2d 531, 533 (D.C.Cir. 1978). Co Petro clearly was an association of persons engaged in the business of selling commodities (petroleum products) within the plain meaning of the statute defining "board of trade." Where the statutory definition is clear on its face we need not delve into legislative history unless it is brought to our attention "that there is within the legislative history something so probative of the intent of Congress as to require a reevaluation of the meaning of the statutory language." *Heppner v. Alyeska Pipeline Service, Co.*, 665 F.2d 868, 871 (9th Cir. 1981). *See Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). We have not been shown nor have

we found any persuasive legislative history indicating that Congress intended the definition of "board of trade" to be narrower than the plain meaning of the statutory language.[14]

Because section 4 prohibits any board of trade from selling futures contracts unless the Commission has designated that board as a contract market, Co Petro has violated the Act. Co Petro points out, however, that since the Commission has not designated a contract market for the futures it sold, it could not comply with section 4. It argues strenuously that Congress could not have intended to make unlawful that which could not be done. We note, however, that section 6(a) of the Act, 7 U.S.C. § 8 (1976), places the burden of seeking contract market designation on the board of trade desiring such status. That section provides in part: "[A]ny board of trade desiring to be designated a 'contract market' shall make application to the Commission for such designation and accompany the same with a showing that it complies with the conditions of section 7 of this title, and with a sufficient assurance that it will continue to comply with the requirements

of such section 7." [15] Co Petro never sought contract market status and cannot complain of the consequences of its absence.

We hold that Co Petro was a board of trade as defined by section 2(a)(1) of the Act, 7 U.S.C. § 2 (1976), and that its failure to trade futures contracts through a designated contract market was in violation of section 4, 7 U.S.C. § 6 (1976). We also hold that Co Petro violated section 4h(1) of the Act, 7 U.S.C. § 6h(1) (1976). This section makes it illegal to conduct a futures business "if such orders, contracts, or dealings are executed or consummated otherwise than by or through a member of a contract market." Therefore, Co Petro's operation of a futures business off of a designated contract market was a clear violation of this section.

## PROPRIETY OF THE ANCILLARY RELIEF

Ancillary to the permanent injunction prohibiting Co Petro from dealing in petroleum futures contracts, the district court ordered the appointment of a receiver, an accounting, and disgorgement [16]. We

14. Co Petro points to the Senate's deletion of the predecessor language to the phrase "on or subject to the rules of a board of trade" from the Future Trading Act, Pub.L.No.67–66, 42 Stat. 187 (1921), and its reinsertion into the Grain Futures Act, Pub.L.No.67–331, § 4, 42 Stat. 999 (1922), as evidence of congressional intent to exempt off-exchange trading from regulation. In passing the Future Trading Act, the Senate feared that retention of the language in the House bill might exempt operations on private exchanges or allow bucket shops. S.Rep. No.212, 67th Cong., 1st Sess. 1 (1921). Other than the fact that Congress reinserted the language in the Grain Futures Act, there is nothing to support Co Petro's interpretation. It is entirely possible that in passing the Grain Futures Act, Congress realized that the broad definition of "board of trade" (adopted scarcely four months earlier in the Future Trading Act) would eliminate any previously expressed fears that the Act would exempt off-exchange trading in the regulated commodities.

15. In order to qualify for designation as a contract market, a board of trade must meet rigid requirements including a demonstration that futures trading in the commodity for which designation as a contract market is sought will not be contrary to the public interest. 7 U.S.C.

§ 7 (1976). After designation, the contract market must continue to adhere to strict requirements and must enforce rules to prevent price manipulation and cornering of the market. 7 U.S.C. §§ 7, 7a (1976).

16. We do not read Co Petro's opening brief as contesting the order for a permanent injunction. In any event, we conclude that the district court correctly issued the permanent injunction on a proper finding that there was a reasonable likelihood of future violations. See Commodity Futures Trading Comm'n v. Hunt, 591 F.2d 1211, 1220–21 (6th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1971); SEC v. Shapiro, 494 F.2d 1301, 1308 (2d Cir. 1974); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100–01 (2d Cir. 1972). Co Petro's conduct was carefully planned, tightly controlled and systematically carried out. Moreover, Co Petro consistently maintained that its conduct was blameless. These factors together with Goldstein's past extensive involvement in commodities markets and several consent judgments and convictions stemming from this involvement justify the permanent injunction.

disagree with Co Petro's contention that the court was without statutory authority to grant the ancillary relief. Under section 6c of the Act, 7 U.S.C. § 13a–1 (1976), the Commission is empowered to bring an action to enforce compliance with the Act or to enjoin conduct violative of it. Upon a proper showing, the district court is empowered to issue permanent or temporary injunctions or restraining orders, writs of mandamus or orders affording like relief, including orders to take such action as is necessary to remove the danger of violation. *Id.* We note that several courts have found ancillary relief pursuant to section 6c proper. *Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211 (6th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979) (disgorgement); *Commodity Futures Trading Commission v. Muller,* 570 F.2d 1296 (5th Cir. 1978) (order prohibiting defendant from concealing or disposing of his assets). We have not previously considered the propriety of ancillary relief under section 6c of the Act. In *Cell Associates, Inc. v. National Institutes,* 579 F.2d 1155 (9th Cir. 1978), however, we held that where a statute provides specific remedies for enumerated kinds of misconduct, the specified remedies are exclusive. *Id.* at 1160, 1162. In *Cell Associates,* we dealt with the civil remedies section of the Privacy Act, 5 U.S.C. § 552a (1976). In that section, Congress authorized equitable relief for two forms of agency misconduct and monetary relief for two other types of misconduct. Plaintiffs sought an injunction where the statute authorized only money damages. In affirming the district court's denial of an injunction, we found it unlikely

that Congress would go to the trouble of specifying which remedy was to be applied to which type of misconduct if it had intended injunctive relief across the board. *Id.* at 1160. Unlike the statute at issue in the *Cell Associates* case, section 6c is very broad. It does not list specific types of misconduct and specific remedies for each; instead, it provides the court with authority to issue a broad variety of orders. *Cell Associates,* then, is not dispositive of the issue before us.

The starting point for interpretation of a statute, of course, is the statutory language itself. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). We have little difficulty in finding that section 6c is broad enough to authorize the appointment of a receiver, an order requiring that the receiver have access to the firm's books and records, and an order for an accounting. Section 6c authorizes the Commission to bring an action to "enforce compliance" with the Act and empowers the court to order "such action as is necessary to remove the danger of violation." 7 U.S.C. § 13a–1 (1976). Ancillary to the permanent injunction, the district court could have found that a receiver and an accounting were justified as a means of assuring that Co Petro would not go back into the futures business in violation of the injunction. Similarly, the order of disgorgement may serve to deter future violations. As the Supreme Court has noted in a similar context: "Future compliance may be more definitely assured if one is compelled to restore one's illegal gains."[17] *Por-*

---

17. The statute at issue in *Porter* provided:

Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or *other order* shall be granted without bond.
Emergency Price Control Act of 1942, Pub.L. No.77–421, § 205(a), 56 Stat. 23, 33 (1942) (emphasis added).
Relying in part on the inherent equitable jurisdiction of the court and in part on the statutory language "other order," the Court decided that an order for restitution was proper under the statute. 328 U.S. at 398–400, 66 S.Ct. at 1089–1090. We believe that the language in section 6c empowering the court to order "such action as is necessary to remove the danger of violation," 7 U.S.C. § 13a–1 (1976), is at least

ter v. Warner Holding Co., 328 U.S. 395, 400, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332 (1946). We also note that unless a statute specifically or by inescapable inference commands the contrary, we are not to deny the inherent equitable powers of a court to afford complete relief. Id. at 398, 66 S.Ct. at 1089. See Mitchell v. DeMario Jewelry, Inc., 361 U.S. 288, 290–92, 80 S.Ct. 332, 334–35, 4 L.Ed.2d 323 (1960); Cell Associates, Inc. v. National Institutes, 579 F.2d 1155, 1160 (9th Cir. 1978).

Finally, we conclude that it would frustrate the regulatory purposes of the Act to allow a violator to retain his ill-gotten gains. Commodity Futures Trading Commission v. Hunt, 591 F.2d 1211, 1223 (6th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). Thus we affirm the district court's award of ancillary relief.

## JUDICIAL NOTICE

We find no error in the district court's taking judicial notice of two consent judgments entered against defendant Goldstein in 1972 and 1973, and of a 1973 conviction of Goldstein. All three proceedings arose out of Goldstein's illegal sales of commodity options. The evidence was relevant to show Goldstein's familiarity with commodities laws and was admissible to rebut Goldstein's contention that Co Petro's actions were, at worst, innocent, technical violations. Fed.R.Evid. 403, 404(b).

## CONCLUSION

The decision of the district court is affirmed.

RUSSELL E. SMITH, District Judge, dissenting.

I dissent.

In my opinion it was not proved that the defendants violated either Sections 4 or 4h (7 U.S.C. §§ 6 and 6h) of the Commodity Exchange Act (7 U.S.C. §§ 1–24) and are,

under the facts shown, subject to the jurisdiction of the Commodity Futures Commission, which was established by the Act of October 23, 1974, Pub.L. 93–463, 88 Stat. 1389.

I turn first to that portion of Section 4 relating to boards of trade (7 U.S.C. § 6). Section 4 of the Act forbids the doing of certain acts in connection with "any contract of sale of commodity for future delivery on or subject to the rules of any board of trade in the United States." Section 2(a)(1) of the Act (7 U.S.C. § 2) defines "board of trade" as follows: "The words 'board of trade' shall be held to include and mean any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling commodity or receiving the same for sale on consignment." This definition, with the exception that the word "commodity" has been substituted for the word "grain," is the exact definition appearing in the Futures Trading Act, ch. 86, § 2, 42 Stat. 187 (1921), and in the Grain Futures Act, ch. 369, § 2(a), 42 Stat. 998 (1922), and there is no reason to believe that the phrase meant anything different in 1974 than it did in 1921 and 1922.

I believe that the term "board of trade" means an organized board of trade or mercantile exchange, such as the Chicago Board of Trade, which is described in Hill v. Wallace, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922), and which has members who are traders and rules which govern the details of trading. When the Futures Trading Act of 1921 was enacted, there were big markets through which substantial parts of the grain production of America was bought and sold. The practice of trading in futures developed on those markets because of the very practical values of such practice to producers and users of commodities in determination of price and in hedging, i.e., insuring against risk of loss by reason of price fluctuation. These values were specifically recognized by Congress in Section 3 of the Grain Futures Act of 1922 and in Section 3 of the Commodity Exchange Act (7 U.S.C. § 5). Speculators

as broad as the phrase "other order" in the

Emergency Price Control Act of 1942.

and manipulators, however, did get into the market and did cause rapid and widespread price fluctuations unrelated to the factors of supply and demand. Congress specifically articulated its concern about these evils in Section 3 of the Grain Futures Act. These evils arose out of what was being done on boards of trade and mercantile exchanges across the nation. In private contracts for future delivery differences in the necessary details obscured the price. On the organized exchanges standardized contracts supplied identical details to each buyer and seller, and the price named reflected the value of the grain and not the details of the trade. A farmer could hedge and insure the price of his grain by private treaty if he could find a buyer who would agree with him in all of the details of the trade and who was financially sound, but it was much simpler to hedge at the market where many buyers dealt in standardized contracts and where there was no solvency problem. The benefits and evils with which Congress was concerned in 1921, 1922, and 1974 were the benefits and evils growing out of organized exchanges—boards of trade. It was these organized exchanges which Congress sought to regulate. The Supreme Court thought so in 1922 when it decided *Hill v. Wallace.* The Court stated: "The act is in essence and on its face a complete regulation of boards of trade with a penalty of 20 cents a bushel on all 'futures' to coerce boards of trade and their members into compliance." 259 U.S. at 66, 42 S.Ct. at 457. The Senate Committee which passed on the Commodity Exchange Act thought so in 1974 when it said the following:

> The Grain Futures Act of 1922 was designed mainly to enable the Government to deal with the exchanges themselves, rather than with individual traders. To conduct futures trading lawfully, the *grain exchanges* were required to be federally licensed or "designated" as "contract markets." A condition of such designation was that the *exchanges* themselves would take major responsibility for the prevention of price manipulation by their members.

S.Rep.No.93–1131, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 5843, 5855 (emphasis added).

There is other evidence confirming the thought that Congress has used the term "board of trade" as the equivalent of "organized exchange."

7 U.S.C. § 13–1(a) provides:

> (a) No contract for the sale of onions for future delivery shall be made on or subject to the rules of any *board of trade* in the United States. The terms used in this section shall have the same meaning as when used in this chapter.

(Emphasis added.) It was the congressional intent to prohibit speculation in onion futures. In dealing with this subject the Senate and House used the terms "boards of trade" and "organized exchanges" interchangeably. Thus, the Committee report states as follows:

> The Committee on Agriculture and Forestry, to whom was referred the bill (H.R. 376) to amend the Commodity Exchange Act to prohibit trading in onion futures in *commodity exchanges,* having considered the same, report thereon with a recommendation that it do pass with amendments.

### PURPOSE OF THE BILL

> This bill would prohibit trading in onion futures on any *board of trade* in the United States.

S.Rep.No.1631, 85th Cong., 2d Sess., *reprinted in* [1958] U.S.Code Cong. & Ad.News 4210, 4210 (emphasis added). H.R.Rep.No. 1036, 85th Cong., 1st Sess., *reprinted in* [1958] U.S.Code Cong. & Ad.News 4212, doesn't use the words "board of trade" at all. It speaks of "commodity exchanges" and lists the New York Mercantile Exchange and the Chicago Mercantile Exchange as the places in the United States where onion futures were traded.

Section 2(a)(1) of the Act (7 U.S.C. § 2) excludes from regulation certain foreign currencies and contracts "unless such transactions involve the sale thereof for future delivery conducted on a *board of trade.*"

(Emphasis added.) S.Rep.No.93–1131, *reprinted in* [1974] U.S.Code Cong. & Ad. News 5843, 5863 reads:

Also, the Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a *formally organized futures exchange.* A great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers. The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary.

(Emphasis added.) The only words used in the Act itself are "board of trade." If, as indicated in the majority opinion, Co Petro and its officers and agents were an association and constituted a board of trade, then the "network of banks and tellers" trading in foreign currency must likewise have been an association, and, if an association, a "board of trade." Obviously Congress gave no such meaning to the words "board of trade," but equated those words with "formally organized futures exchange."

Section 3 of the Act (7 U.S.C. § 5) reads as follows: "Transactions in commodity involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest." Here Congress uses the words "board of trade" to embrace all of the exchanges on which futures are sold.

Not conclusive, but indicative that Congress, in defining "board of trade," had in mind something different from a mere association of individuals, is the incorporation in the law of words suggestive of organized exchange. Thus Section 4g (7 U.S.C. § 6g) uses the terms "clearinghouse," "floor brokers," and "futures commission merchants." The words "members" and "rules" appear

1. Section 4h was added by the Act of June 15, 1936, 49 Stat. 1496.

2. The language of Section 4h is sufficiently similar to the language found in Section 4 so

throughout the Act. None of the words mentioned in this paragraph bear any relationship to persons operating as were the defendants here.

For these reasons I am of the opinion that the sales made in this case were not made "on or subject to the rules of any board of trade."

I now turn to Section 4h(1) of the Act (7 U.S.C. § 6h(1)),[1] which reads:

It shall be unlawful for any person—

(1) to conduct any office or place of business . . . for the purpose of soliciting or accepting any orders for the purchase or sale of any commodity for future delivery, or for making or offering to make any contracts for the purchase or sale of any commodity for future delivery, or for conducting any dealings in commodities for future delivery, that are or may be used for

(A) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or

(B) determining the price basis of any such transaction in interstate commerce, or

(C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof,

if such orders, contracts, or dealings are executed or consummated otherwise than by or through a member of a contract market . . . .

Almost identical language is found in §§ 4,[2] 4b, and 4c of the Act (7 U.S.C. §§ 6, 6b, and 6c). This language indicates to me that there are three kinds of futures sales which are regulated:

1. Those conducted on a board of trade;

2. Those not conducted on a board of trade but made subject to the rules of a board of trade; and

3. Those conducted by bucket shops or other private traders which are or could

that what is said here disposes of the problems arising under that part of Section 4 which deals with persons rather than boards of trade.

be used for hedging or price determination.

If, as has been indicated, Congress regulated rather than abolished futures trading so as to preserve the valid economic uses of futures trading, i.e., price determination and hedging, then the foregoing interpretation makes some sense.

Sales made on a board of trade determine price. Sales made subject to the rules of a board of trade would probably be sales under a standardized contract, and any substantial volume of such sales could be used to determine price. It is conceivable that under some fact circumstances sales not related to boards of trade or the rules of such boards could be used to determine price. Any private sales could be used for hedging. In my opinion, sales which do not fall within classes 1, 2, or 3 above are not regulated.

Section 4h(1) refers to: orders for "future delivery"; contracts for the "purchase or sale of any commodity for future delivery"; and dealings in "commodities for future delivery." The language is not entirely clear. For instance, the words "orders for the purchase or sale of any commodity for future delivery," read literally, could describe every order made from a mail order catalog. I do not think Congress intended that meaning.

There is no indication in the entire legislative history of Section 4h(1) that Congress intended to regulate the kinds of fraud that might be involved in every private sale of goods to be delivered at a future date.[3]

There is an indication that Congress intended by Section 4h to regulate the sale of "futures" as that term is used in the trading markets of the nation. Thus, H.R.Rep. No.421, 74th Cong., 1st Sess. 6 (1935) states: "Section 4h(1) prohibits operation of a place of business where orders *for futures contracts* are solicited or accepted unless such orders are to be executed by or through a member of a contract market." (Emphasis added.)

Next, as I see it, the words of Section 4h(1), "that are or may be used for," limit the language of each of the disjunctive phrases in the section. The language as to orders is followed by a comma; the language as to contracts for future sales is followed by a comma; and the language as to dealings is followed by a comma. This suggests that it was the intent of Congress that the limiting language of Subsections (A) (relating to use for hedging) and (B) (relating to use for price determination) limits the language relating to each of the three kinds of acts mentioned in the section. This interpretation is almost compelled by an amendment of Section 4h(1) which was made on the floor of the House. That amendment [4] did no more than place a comma after the word "delivery" and before the words "that are or may be used for." It could serve no purpose other than to indicate that the words following the inserted comma did not modify only the phrase (immediately preceding it) relating to "dealings in commodities for future delivery," but rather to each of the three preceding disjunctive phrases.

I am troubled by Subsection (C) of Section 4h(1). I note that, while Subsections (A) and (B) contain limitations, Subsection (C) is not limiting in character but rather expansive. The layout puzzles me. If Subsection (C) is read without any reference to Subsections (A) and (B), then any delivery made in accordance with an order for such delivery would violate the Act, even though the order itself, not being of the kind mentioned in the limiting language of Subsections (A) and (B), was lawful. I am inclined to think that the word "thereof" at the end of Subsection (C) refers to orders, contracts, and dealings (appearing in the body of Section 4h(1)) and that it refers to those acts as they are limited by Subsections (A) and (B). I think that Congress did not intend that the act of delivery of goods in fulfillment of a lawful order would be unlawful.

Finally, if by Section 4h Congress intended to regulate all dealing in commodities

---

**3.** *See* 80 Cong.Rec. 491, 1451, 4391, 6159, 6612, 7051, 7710, 7845, 7857, 7905, 7907, 7916, 7918, 8010, 8288, 8293, 8824, 8825, 9286, and 9313 (1936).

**4.** 80 Cong.Rec. 7916 (1936).

for future delivery, whatever the meaning of the words "for future delivery" may be, such could have been done in one simple sentence. The convoluted language and structure of Section 4h must mean something else.

In this case no contention is made that the sales of the defendant were or could be used to determine price, or that they were or could be used for hedging. The district court made no findings as to any relationship between defendants' acts and price determination or hedging. In the absence of such fact-finding, I think no violation of Sections 4 or 4h of the Act was proved.

I would reverse and remand the case to the district court with instructions to dismiss the action or, if application is made by plaintiff to prove the defendants' actions were or could be used for price determination or hedging, to make such orders permitting amendments and the introduction of new evidence as the district court should in its discretion deem proper.