In re Keith D. BYBEE, Sr.; Eleonore J. Bybee, dba Keith Bybee Enterprises, Debtors.

John E. KROMMENHOEK, Trustee, Appellant,

v.

A-MARK PRECIOUS METALS, INC.; A-Mark Financial Corporation; Spiral Metals, Inc., Appellees.

No. 90-35604.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1991.

Decided Sept. 27, 1991.

Blaine F. Evans and Jed W. Manwaring, Evans, Keane, Koontz, Boyd, Simko & Ripley, Boise, Idaho, for appellant.

John F. Kurtz, Jr., Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for appellees.

David G. High and Marilyn T. Scanlan, Deputy Atty. Gen., Boise, Idaho, for amicus curiae State of Idaho.

Jay L. Witkin and Edward S. Geldermann, Washington, D.C., for amicus curiae Commodity Futures Trading Com'n.

Terence F. Gilheany, Cadwalader, Wickersham & Taft, New York City, for amicus curiae Commodities Corp. (U.S.A.) N.V.

Thomas E. Heftler, Melvin A. Brosterman, Marvin J. Goldstein and Elizabeth A. Mullins, Stroock & Stroock & Lavan, New York City, for amici curiae J. Aron & Co. and AIG Trading Corp.

Mark D. Young, John H. Stassen, Maureen A. Donley–Hoopes, Susan P. Potter, Kirkland & Ellis, Washington, D.C. and Chicago, Ill., for amici curiae The Bd. of Trade of the City of Chicago, Chicago Mercantile Exchange, Commodity Exchange, Inc. and New York Mercantile Exchange.

Before WRIGHT, FARRIS and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Keith D. Bybee, Sr., acting in some instances for his own account and at other times for customers, bought gold and silver, bullion and coins, from A–Mark Pre-

cious Metals ("A–Mark"). Bybee left a substantial amount of the precious metals on deposit with A–Mark. Unknown to Bybee's customers, A–Mark held a lien on all of this metal to secure amounts owed by Bybee for purchases on margin. The price of silver dropped, and Bybee liquidated his account, selling to A–Mark at the market price all of the precious metals A–Mark then held on deposit. This sale brought over $2 million, but when Bybee's debt to A–Mark was settled, only some $300,000 remained. Bybee needed much more than this to settle the accounts of his customers. He tried to make up the shortfall by investing in the commodities market. That effort failed, and he filed for protection under the Bankruptcy Act.

The trustee-in-bankruptcy sought to rescind Bybee's purchases from A–Mark on the ground that these purchases constituted off-exchange future contracts in violation of the Commodity Exchange Act ("CEA").[1] The trustee also sought to recover the value of the precious metals Bybee sold to A–Mark, asserting that the liquidation of the account constituted a fraudulent transfer under 11 U.S.C. §§ 544 and 548.

The bankruptcy court granted summary judgment in favor of A–Mark on the fraudulent transfer claims. After a trial on the trustee's CEA claim, the bankruptcy court recommended findings of fact and conclusions of law that Bybee's purchases from A–Mark did not constitute off-exchange futures contracts, and thus did not violate the CEA.

The district court affirmed summary judgment on the fraudulent transfer claims, and adopted the bankruptcy court's findings of fact on the CEA claim. The district court concluded that no violation of the CEA had occurred because the transactions between Bybee and A–Mark were non-public transactions between commercial parties.

We have jurisdiction under 28 U.S.C. §§ 158(c) and 1291. We affirm in part and remand for further proceedings to award

attorney fees to A–Mark for the defense of the fraudulent transfer claims, for which Idaho state law provides the rule of decision, but not for the defense of the claims resolved under federal law.

## FACTS

Bybee began buying silver from A–Mark in 1979. He resold the silver to his customers, earning a commission on the sales. Initially, Bybee bought no precious metals from A–Mark unless he had first made arrangements for its resale to one of his retail customers. Later, he bought precious metals for his own account as well as for his customers.

Bybee bought precious metals from A–Mark pursuant to a form Trading Agreement. This Agreement provided for two types of transactions: "Immediate Delivery Sales and Purchases" and "Deferred Delivery (margin) Sales." Until April of 1982, most of the purchases involved in this appeal took the form of Immediate Delivery Sales.

In an Immediate Delivery Sale, A–Mark required Bybee to pay cash in full within 48 hours of the purchase. A–Mark then delivered the goods to Bybee or Bybee's customer. When A–Mark bought metal from Bybee, Bybee was required to deliver the metal to A–Mark within five days. From 1979 until April of 1982, 98% of these transactions resulted in the physical delivery of precious metal to Bybee or his customers.

In a Deferred Delivery Sale, Bybee made an immediate down payment of 20% (later reduced to 10%) and obtained physical delivery upon paying the balance. The balance due A–Mark was secured with a lien on all undelivered metals bought under the Deferred Delivery plan.

Bybee advised his customers that they did not have to take actual delivery but could instead store their metal at A–Mark for up to two years at no cost. In fact, the "storage" was a Deferred Delivery Sale and A–Mark held a lien on the stored metal

---

1. In this appeal we do not reach the question whether rescission of an off-exchange transaction is a remedy afforded under the Commodity Exchange Act. *See* 7 U.S.C. § 7(a).

securing all of Bybee's purchases, both for himself and for his customers, even though a customer may have paid 100% of the purchase price.

As silver declined in value, A–Mark made margin calls on Bybee. After exhausting his own assets, Bybee borrowed from friends and customers in an effort to reduce the A–Mark debt. By May 1986, Bybee was unable to raise more money or provide additional metals to satisfy A–Mark's margin calls. He then sold to A–Mark for $2,126,692.70 all metal it held for deferred delivery. This price represented the current value of the metals at the time sold.

After offsetting Bybee's debt, A–Mark paid Bybee approximately $300,000 in cash. Bybee did not advise his customers of this sale. Instead, he invested the $300,000 in commodity futures with the hope of quickly recovering his losses. This failed, and on February 27, 1987 he filed for relief under the Bankruptcy Code.

## ANALYSIS

### A. Claims Arising Under the Commodity Exchange Act

The CEA makes it "unlawful for any person to offer or enter into ... a contract for the purchase or sale of a commodity for future delivery ... unless ... such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commodity Futures Trading Commission as a 'contract market' for such commodity...." 7 U.S.C. § 6(a). A futures contract that violates this provision is deemed an illegal "off-exchange" futures contract.

To avoid application of the CEA to every executory contract,[2] Congress limited its reach in section 2(a)(1)(A). This section, known as the "cash forward contract" exclusion, provides: "The term 'future delivery' ... shall not include any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2 (1988).

■ The trustee contends Bybee's margin purchases were illegal off-exchange futures contracts.[3] A–Mark argues that the transactions were cash forward contracts, exempt from the exchange trading requirements of the CEA. We consider the parties' contentions in order, determining first whether the transactions were futures contracts under the CEA.[4]

### 1. Were the margin purchases futures contracts?

"Commodity futures transactions involve standardized contracts for the purchase or sale of commodities which provide[ ] for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally are secured by earnest money, or 'margin.' " *In re Stovall*, [1977–1980 Transfer Binder], Comm.Fut.L.Rep. (CCH) ¶ 20,941, at 23,-777. Each element need not be present for a transaction to be a futures contract. *Id.* Instead, "[t]he transaction must be viewed as a whole with a critical eye toward its underlying purpose." *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 581 (9th Cir.1982).

---

**2.** The Act's definition of a "commodity" includes certain specified agricultural commodities and "all other goods and articles ... and all services, rights and interests" except onions. 7 U.S.C. § 2.

**3.** The trustee argues alternatively that the 10%/20% purchases, if not futures contracts, were illegal leverage contracts. *See* 17 C.F.R. § 31.4(w) (1991). The trustee is mistaken. "Under the Commission's interpretation of the Commodity Exchange Act, there can be no such thing as a leverage contract with a duration of less than ten years." *CFTC v. P.I.E., Inc.*, 853 F.2d 721, 724 (9th Cir.1988). The Trading

Agreement between A–Mark and Bybee provides for a duration of two years.

**4.** The trustee also contends the district court erred in refusing to permit the trustee's legal expert to testify. This testimony was offered to provide the court with the expert's opinion of the proper legal definition of a forward contract under the CEA. We conclude the district court did not abuse its discretion in refusing to permit this testimony. *See United States v. Unruh*, 855 F.2d 1363, 1376 (9th Cir.1987), *cert. denied*, 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988); *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir.1986).

■ A–Mark argues the contracts are not futures contracts because they lack standardized terms and are not accompanied by a clearinghouse, standardized or exchange-style variation margining, a settlement system or the right to assign the contracts. We disagree.

We recognized in *Co Petro* that a contract that does not contain wholly standardized terms can still be considered a futures contract if the seller implicitly guarantees that it will provide for offset. *Id.* at 580. In *Co Petro*, we stressed "the rationale for standardization in futures trading." *Id.* We noted that, "The ability to form offsetting contracts [in the futures market] is essential, since investors rarely take delivery against the contracts." *Id.* In *Co Petro*, the seller provided a contractual right of offset. Co Petro's customers, "like customers who trade on organized futures exchanges," received the benefit of offset, and the contracts' degree of standardization could be disregarded. *Id.*

A similar situation exists here. The district court found that A–Mark implicitly represented that it would provide for offsetting contracts, even though the contracts it sold were not entirely standardized. As in *Co Petro*, this is enough to satisfy the standardization requirement.

A–Mark also argues the transactions at issue cannot be futures contracts because a number of factors generally associated with organized futures exchanges are not present. But as the CFTC has noted, "[T]he requirement that a futures contract be executed on a designated contract market is what makes the contract legal, not what makes it a futures contract." *First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,-698, at 30,970 (1985).

We conclude the margin purchase transactions between A–Mark and Bybee were futures contracts.

2. *Are the margin purchases exempt from the CEA as forward contracts?*

Congress "intended to cover [with the cash forward exclusion] only contracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts." *Stovall*, at 23,777. "Although the desire to acquire or dispose of a physical commodity is the underlying motivation for entering such a contract, delivery may be deferred for purposes of convenience or necessity." *Id.* at 23,778.

In the present case, the district court characterized the A–Mark/Bybee transactions as cash forward contracts because they were commercial transactions between Bybee and A–Mark. The district court thus carved out a non-public commercial party exception to commodities regulation. Neither the parties nor the amici champion this approach on appeal.

■ While public involvement is certainly a factor to consider in deciding whether a particular transaction constitutes a cash forward contract or an illegal off-exchange futures contract, it is not the sole determinant of the status of a transaction. Here, the concept of delivery is the determining factor.

In *Co Petro*, we required a subjective intent as well as an objective showing of the delivery obligation. 680 F.2d at 578. We noted that the cash forward contract exclusion applies only where "the parties contemplate physical transfer of the actual commodity." *Id.*

Our opinion in *Co Petro* did not discuss the nature of the legal obligations created by the purchase agreement. We did not include in our cash forward contract discussion any mention of the fact that Co Petro's purchase contracts did not impose "the forced burden of delivery" on either party. *Id.* at 580. Instead, the facts underlying the purchase agreement assumed primary importance.

Since we decided *Co Petro*, the CFTC has issued several interpretive releases discussing the elements of a cash forward contract. In 1985, the CFTC sought to distinguish cash forward contracts from certain forms of option contracts. *See Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options*, 50 Fed.

Reg. 39656 (Sept. 30, 1985). The CFTC characterized a forward contract as "a binding agreement on both parties to the contract: one must agree to make delivery and the other to take delivery of the commodity." *Id.* at 39657–58. The CFTC also noted that the parties to forward contracts "have the capacity to make or take delivery" and that delivery generally occurs. *Id.* at 39658.

The CFTC in December 1987 revisited forward contracts in an advanced notice of proposed rulemaking. *See Regulation of Hybrid and Related Instruments,* 52 Fed. Reg. 47022 (Dec. 11, 1987). In this release the CFTC acknowledged the changing face of forward contract transactions:

> [C]ommodity transactions between commercial counterparties in certain markets have evolved from contracts for deferred delivery of a physical commodity pursuant to which delivery generally occurs to transactions that have highly standardized terms, occur on a recurrent basis among an identifiable group of commercial participants and are frequently satisfied by the cancellation of contractual obligations based upon the payment of intervening market price changes. Although such transactions may be settled other than by delivery on more than an occasional basis, it appears that departure from the traditional requirement of settlement by delivery of the physical commodity occurs on the basis of privately negotiated agreements by principals who have the capacity to make or take delivery, who contemplate actual delivery or acceptance of delivery in some of those transactions, but who may be unable to determine at the inception of the transaction that delivery will not be required.

*Id.* at 47027.

In a more recent discussion, the CFTC sought "to make clear its view that certain transactions between commercial parties

... are encompassed by the Section 2(a)(1) exclusion and therefore are outside the scope of the Commission's regulatory jurisdiction under the Commodity Exchange Act." *Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39189 (Sept. 25, 1990) (the "Statutory Interpretation"). The CFTC recognized that the commercial landscape had changed, and that modern, more sophisticated forward contracts

> entered into between commercial counterparties in normal commercial channels, serve the same commercial functions as did those forward contracts which originally were the subject of the section 2(a)(1) exclusion notwithstanding the fact that, in specific cases and as separately agreed to between the parties, the transactions may ultimately result in performance through the payment of cash as an alternative to actual physical transfer or delivery of the commodity.

*Id.* at 39191.

The real innovation contained in the Statutory Interpretation is its treatment of the delivery obligation.[5] Acknowledging that commercial parties often agree to "book-out," or offset, the contractual delivery obligations, the CFTC concluded that

> while such agreements may extinguish a party's delivery obligation, they are separate, individually negotiated, new agreements, there is no obligation or arrangement to enter into such agreements, they are not provided for by the terms of the contracts as initially entered into, and any party that is in a position in a distribution chain that provides for the opportunity to book-out with another party or parties in the chain is nevertheless entitled to require delivery of the commodity to be made through it, as required under the contracts.

*Id.* at 39192.

■ We give "great deference to the Commission's interpretation of the Com-

---

**5.** The Statutory Interpretation makes clear that its broader definition of forward contracts applies only to "transactions entered into for commercial purposes related to the business of a producer, processor, fabricator, refiner or merchandiser, who may wish to purchase or sell a commodity for deferred shipment or delivery in connection with the conduct of its business." *Statutory Interpretation,* 55 Fed.Reg. at 39191. The CFTC also stressed the parties "capacity to make or take delivery." *Id.*

modity Exchange Act." *CFTC v. P.I.E., Inc.*, 853 F.2d 721, 724 (9th Cir.1988). Not only is the CFTC charged generally with administering the CEA, *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("great deference [should be given] to the interpretation given the statute by the officers or agency charged with its administration."), but the field of commodities regulation is complex, and responsive to a rapidly changing market. *See United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

In its Statutory Interpretation, the CFTC explained:

> The underlying postulate of the exclusion is that the Act's regulatory scheme for futures trading simply should not apply to private commercial merchandising transactions *which create enforceable obligations to deliver* but in which delivery is deferred for reasons of commercial convenience and necessity.

55 Fed.Reg. at 39190 (emphasis supplied).[6]

Here, both A–Mark and Bybee had the legal obligation to make or take delivery upon demand of the other. Accordingly, consistent with the Statutory Interpretation, we conclude section 2(a)(1) of the CEA precludes application of the exchange trading requirement to these transactions.

**B. The Trustee's Fraudulent Conveyance Claims**

The trustee also sought to recover as a fraudulent conveyance Bybee's pre-bankruptcy transfer of precious metals to A–Mark. The bankruptcy court granted summary judgment for A–Mark. The district court found that Bybee held only the bare legal title to the transferred property and affirmed. We agree.

 In order to bring property into the estate as a fraudulent conveyance, the trustee must first show that the transfer was "of an interest of the debtor in proper-

ty." 11 U.S.C. § 548 (1988). Property in which the debtor possessed only legal title cannot be recovered for the benefit of the bankruptcy estate. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n. 8, 205 n. 10, 103 S.Ct. 2309, 2313 n. 8, 2314 n. 10, 76 L.Ed.2d 515 (1983) ("The legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title. . . ."); *In re Torrez*, 827 F.2d 1299, 1303 (9th Cir.1987) ("The Debtors possessed nothing beyond bare legal title. . . . [T]he estate has no interest in the property.").

The trustee does not dispute that Bybee held only the bare legal title to the property transferred to A–Mark. The trustee, therefore, cannot avoid the transfer pursuant to 11 U.S.C. § 548.

**C. Attorney Fees**

The district court awarded attorney fees to A–Mark for its successful defense of counts two through seven. The district court determined that Idaho Code § 12–120(3) entitled A–Mark to its reasonable attorney fees.

In counts three through six the trustee sought to avoid Bybee's transfer of precious metals to A–Mark, pursuant to 11 U.S.C. § 544(b), on the ground that Bybee's transfer was voidable as fraudulent under Idaho law. Section 544(b) allows a trustee to avoid any transfer that would be voidable under state law. *Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir.1988). Thus, state law governs the resolution of the merits of counts three through six.

We have held that state law governs an award of attorney fees if "state law and not federal bankruptcy law provides the rule of decision in a contested matter." *Holiday Mobile Home Resorts v. Wood*, 803 F.2d 977, 979 (9th Cir.1986) (applying Arizona doctrine of *res judicata* to petitioner's motion to reopen bankruptcy);

---

6. This language was adopted in response to *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F.Supp. 1472 (S.D.N.Y.1990), and can be compared with that used in an earlier draft based upon the *Co Petro* standard. The draft language stated that the regulatory scheme should not apply to "transactions in which actual delivery is contemplated." *Statutory Interpretation Concerning Transactions*, CFTC (DRAFT) (June 29, 1990).

*Merced Prod. Credit Ass'n v. Sparkman (In re Sparkman)*, 703 F.2d 1097, 1099 (9th Cir.1983) (applying state contract and tort law raised by debtor-in-bankruptcy's counterclaims against claimant).

Neither *Holiday Mobile Home Resorts* nor *Sparkman* involved incorporation of state law by an applicable federal statute. State law was applicable in *Holiday Mobile Home Resorts* because the *res judicata* effect of a previous state court judgment is determined by the law of the rendering court. *See generally* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4469, at 659–60 (1981). And, state law was applicable in *Sparkman* because the bankruptcy court had ancillary jurisdiction over the debtor-in-bankruptcy's state law counterclaim.

■ Although section 544(b) does not incorporate Idaho Code § 12–120(3), a circumstance which weighs against a fee award on counts three through six, *see Bakst v. Presley (In re E.D. Presley Corp. Ltd.)*, 44 B.R. 781 (Bankr.S.D.Fl.1984), attorney fees may be awarded on an alternate basis. In *Holiday Mobile Home Resorts*, we held that a court should award attorney fees "if [a state] court would [award] fees in an action ... raising the same issues." 803 F.2d at 979. Prior to bankruptcy, Bybee personally could have brought counts three through six in an Idaho state court. In such an action, Idaho Code § 12–120(3) would have permitted A–Mark, as prevailing party in a civil action on a commercial transaction, to recover its reasonable fees. *See Brower v. E.I. DuPont de Nemours and Co.*, 117 Idaho 780, 792 P.2d 345, 349 (1990) (allowing recovery of attorney fees when "commercial transaction is integral to the claim and constitutes the basis upon which the party is attempting to recover").

We conclude that under *Holiday Mobile Home Resorts* and *Sparkman*, Idaho Code § 12–120(3) permits A–Mark to recover its reasonable attorney fees as to counts three through six.

With regard to counts two and seven, however, federal law provides the rule of decision. In count two, the trustee sought to avoid the transfer of precious metals to A–Mark pursuant to 11 U.S.C. § 548. We affirmed summary judgment on this count because the transfer was not "of an interest of the debtor in property" under the terms of section 548(a). *See Whiting Pools*, 462 U.S. at 205 n. 10, 103 S.Ct. at 2314 n. 10. Count seven was the CEA claim, and, as discussed above, we affirmed summary judgment because we concluded the purchases were exempt from the CEA.

Under federal law, the prevailing party is not entitled to attorney fees unless authorized by "contract, applicable statute, or other exceptional circumstances." *Richardson v. Alaska Airlines, Inc.*, 750 F.2d 763, 765 (9th Cir.1984). The Bankruptcy Code does not provide for recovery of attorney fees for counts two and seven. *See* 3 Cowans, Bankruptcy Law and Practice § 17.14, at 67 (1989) (listing sections of Bankruptcy Code providing for attorney fees). Further, there is neither a contract nor other exceptional circumstance in this case that warrants recovery of attorney fees for the defense of these counts.

We conclude A–Mark is not entitled to attorney fees for its defense of counts two and seven.

■ Because the district court did not allocate its attorney fee award between defense of the claims under state law, for which attorney fees are recoverable, and the claims under federal law, for which attorney fees are not recoverable, we vacate the award of attorney fees and remand this case to the district court to determine the appropriate amount of attorney fees recoverable for defense of counts three through six. The parties will bear their own costs on appeal.

AFFIRMED in part, VACATED in part and REMANDED.