COMMODITY FUTURES TRADING
COMMISSION, Plaintiff–
Appellee,

v.

NOBLE METALS INTERNATIONAL,
INC., Moorgate Ltd., et al.,
Defendants–Appellants.

COMMODITY FUTURES TRADING
COMMISSION, Plaintiff–
Appellee,

v.

NOBLE METALS INTERNATIONAL,
INC., Defendant,

and

Richard Schulze, Defendant–Appellant.

COMMODITY FUTURES TRADING
COMMISSION, Plaintiff–
Appellee,

v.

NOBLE METALS INTERNATIONAL,
INC., Defendant,

and

Richard D. Portaro, Jr., Defendant–
Appellant.

COMMODITY FUTURES TRADING
COMMISSION, Plaintiff–
Appellee,

v.

NOBLE METALS INTERNATIONAL,
INC., Defendant,

and

Moorgate Ltd., Defendant–Appellant.

Nos. 93–16961, 93–17285, 93–
17291 and 93–17361.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 1995.

Decided Sept. 26, 1995.

Richard Schulze, Chicago, Illinois, pro se.

Richard Portaro, Jr., Washington, DC, pro se.

John A. Field III, McLean, Virginia, for appellants.

Jeffrey S. Holik, Assistant General Counsel, Washington, DC, for appellees.

Before: REINHARDT, THOMPSON and KLEINFELD, Circuit Judges.

Opinion by Judge THOMPSON; Partial Dissent by Judge REINHARDT.

DAVID R. THOMPSON, Circuit Judge:

Noble Metals International, Inc.; Moorgate Ltd.; Richard Schulze, a principal of Moorgate and assistant secretary of Noble; and Richard Portaro, Jr., Moorgate's former sales manager, (collectively defendants) appeal the district court's grant of summary judgment in favor of the Commodity Futures Trading Commission (the CFTC or the Commission). The district court held that the defendants violated section 4(a) of the Commodity Exchange Act (the CEA or the Act), 7 U.S.C. § 6(a) (1988), by offering and selling to the public illegal "off-exchange" futures contracts. The district court also held the defendants committed fraud in connection with such sales, in violation of section 4b of the Act, 7 U.S.C. § 6b (1988).

The defendants contend the contracts which were sold to the public were not futures contracts, but rather cash forward contracts, which are excluded from the CFTC's jurisdiction. Noble and Moorgate further contend the district court erred in prohibiting payment of attorney fees from their frozen assets.[1]

In addition to joining in Noble's and Moorgate's arguments, the individual defendants, Schulze and Portaro, offer additional arguments of their own. Schulze argues he is entitled to the defenses of estoppel, laches and statute of limitations. We have examined Schulze's individual arguments and conclude they are meritless.

Portaro argues the district court erred in granting summary judgment against him under section 4(a) of the Act, because he neither created nor maintained the contracts, and relied in good faith on legal opinions that the contracts complied with the Act. He also argues the district court erred in granting

---

1. Another issue raised by Noble and Moorgate—whether the district court erred by failing to conduct a third hearing before granting the pre-liminary injunction—is mooted by our decision on the merits.

summary judgment against him under section 4b of the Act, because genuine issues of material fact exist as to whether he had the necessary intent to defraud.

We affirm the district court's grant of summary judgment against all of the defendants on the section 4(a) count, and against all of the defendants except Portaro on the section 4b count. We also affirm the district court's denial of the request for payment of attorney fees from Noble's and Moorgate's frozen assets, and the district court's permanent injunction.

### FACTS

Beginning in November 1989, Noble and Moorgate offered and sold contracts for the purchase and sale of precious metals to members of the general public under a program known as the "Forward Delivery Program." For a 15% "administrative fee," Forward Delivery Program customers obtained the right and the obligation to make or take delivery of specified quantities of precious metals at a price agreed upon at the time of formation of the Forward Delivery Program contract. After contacting a customer, Noble's and Moorgate's salespeople would send out a package of documents, including "Confirmation of Purchase/Sale" and "Terms and Conditions of Purchase and Sale." These documents described the program in pertinent part:

The administrative fee covers a two year period commencing on the date the order is placed. Customer at his election and upon providing notice to NOBLE may take or make delivery at anytime during said period. If Customer does not elect to take or make delivery within the initial two year period, Customer, upon payment of ... additional administrative fee[s] [may extend the delivery obligation by three years].... ALL CUSTOMERS ARE REQUIRED TO TAKE OR MAKE DELIVERY OF THE MERCHANDISE CONTRACTED. Delivery and transfer of title in return for payment are of the essence in the Extended Delivery Program. Prior to the delivery date, Customer must provide payment in full of the entire purchase price due to NOBLE or deliver acceptable hallmarked bullion as specified, as the case may be. This transaction cannot be liquidated through an offset.

Noble and Moorgate arranged for certain companies to act as "third-party agents" for the receipt and delivery of metals on behalf of their customers. Under this arrangement, a customer would receive legal title in the form of an invoice when he remitted the full purchase price. Instead of taking physical delivery, however, the customer would contract for the third party to receive, and then to sell, the metal. As a practical matter no actual metal would change hands; the third party would simply sell the metal back to Noble in a paper transaction. The third party would then receive a percentage fee, and the customer would receive the proceeds from the sale.

Noble and Moorgate continued to offer their Forward Delivery Program to customers until September 1991. In January 1992, the CFTC filed its complaint in this case. The CFTC sought injunctive and ancillary equitable relief, including a temporary restraining order, preliminary and permanent injunctions, a freeze of the defendants' assets, an accounting, disgorgement, restitution, and the appointment of a receiver.

On May 11, 1993, the district court issued an order adopting a report and recommendation of the magistrate judge that sanctions be imposed on Noble and Moorgate for failure to comply with certain discovery orders. The Commission had served Noble and Moorgate with notices of depositions pursuant to Federal Rule of Civil Procedure (Rule) 30(b)(6), scheduling depositions for July 8, 1992. On the deposition date, only defense counsel appeared because Noble and Moorgate had failed to designate any deposition representative. Their counsel assured the CFTC that appropriate designations would be made, and the depositions were rescheduled. At the next scheduled deposition date, Schulze, a principal officer of Noble, appeared on behalf of Noble and Moorgate. He invoked his Fifth Amendment privilege against self-incrimination, and refused to answer any relevant questions.

In ruling on the Commission's subsequent motion to compel, the magistrate judge found Noble and Moorgate had representatives available to them who would not invoke their Fifth Amendment privilege and that Noble and Moorgate had not made a good faith effort to locate a suitable representative. The magistrate judge then imposed a $500 sanction, and ordered the corporations to "designate a person to represent them, pursuant to Fed.R.Civ.P. 30(b)(6), *who will not invoke the fifth amendment privilege.*" (emphasis added).

The sanction was never paid. Rather than designate an appropriate representative, seek reconsideration of the order, or seek a protective order, Noble and Moorgate merely provided a list of persons who, for various reasons, would *not* testify. They then designated Schulze as their representative, knowing he would invoke the privilege against self-incrimination.

The Commission moved for sanctions in January 1993. In response, Noble and Moorgate for the first time sought a protective order. After receiving the pleadings, the magistrate judge ordered the corporations to explain "how responding to the area of inquiry would place either Defendant in danger of self-incrimination." Neither Noble nor Moorgate responded.[2] Based on its adoption of the magistrate judge's findings, and pursuant to Rule 37(b)(2)(A), the district court ruled that all allegations of the complaint would be established as true against Noble and Moorgate.

The court granted a temporary restraining order and later issued a preliminary injunction. Both sides moved for summary judgment. The district court granted summary judgment in favor of the CFTC, and denied the defendants' motion for summary judgment. The district court also issued a permanent injunction against Noble and Schulze, appointed a permanent receiver over Noble's and Moorgate's already-frozen assets, and ordered the individual defendants to disgorge profits made from the sale of the Forward Delivery Program contracts. This appeal by Noble, Moorgate, Portaro and Schulze followed.[3]

## DISCUSSION

### A. Summary Judgment

#### 1. Against Noble and Moorgate

■ In granting summary judgment against Noble and Moorgate, the district court relied on the allegations of the complaint which it accepted as established. It did this pursuant to the sanction it had imposed for violation of the court's discovery order. On appeal, Noble and Moorgate contend the district court abused its discretion by imposing such a harsh sanction.

Rule 37(b)(2) provides in pertinent part:

**(2) Sanctions by Court in Which Action is Pending.**

If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order....

Fed.R.Civ.P. 37(b)(2).

■ Sanction orders taking the plaintiff's allegations as established and awarding judgment on that basis are "the most severe

---

2. In their objections to the magistrate judge's report and recommendation, Noble and Moorgate contended they never received the minute order. The district court rejected this contention, noting that even if true, Noble and Moorgate could have included the necessary information in their objections.

3. In addition to the parties' briefs, we have also carefully considered briefs submitted by amicus curiae, Noble Customers Association.

penalty," and are authorized only in "extreme circumstances." *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 603, 603 n. 5 (9th Cir.1988) (citing *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334, 1338 (9th Cir.1985)). To justify the imposition of such a harsh sanction, the district court must find that the violations were "due to willfulness, bad faith, or fault of the party." *Id.* at 603 (quoting *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir.1983)). However, "[i]n reviewing the sanction, the question is not whether we would have imposed a different sanction had we considered the matter originally, but whether the district court 'exceeded the limits of its discretion.'" *Id.* (quoting *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 379 (9th Cir.1988)).

Both the magistrate judge and the district court specifically found that Noble and Moorgate willfully violated the court's orders by repeatedly failing to designate a representative who would testify at a discovery deposition. Noble and Moorgate argue there was no officer, director or managing agent available to testify, either because they were no longer employed by Noble and Moorgate, they would invoke the Fifth Amendment privilege, or they otherwise would not consent to testify.

Noble and Moorgate, however, made no showing of any good faith attempt to designate an available representative. The list they submitted, purportedly in response to the magistrate judge's November 9, 1992 order, lists only six individuals, all of whom could not testify for one reason or another. Significantly, Moorgate alone employed at least 148 people. In addition, by their own admission Noble and Moorgate never contacted some of the very "witnesses" they listed in their designation. For some of these witnesses, they merely stated summarily that the witnesses refused to testify, without explaining the basis for the witnesses' refusal.

Had Noble and Moorgate truly been unable to designate a representative, they could have sought a protective order. *See United States v. Kordel,* 397 U.S. 1, 9, 90 S.Ct. 763, 768, 25 L.Ed.2d 1 (1970) (appropriate remedy where a corporation finds it has no agents who can testify without invoking the privilege is a protective order under Rule 30(b)). By eschewing any application for such an order, and instead declining to make an appropriate designation of someone to testify, Noble and Moorgate engaged in a calculated course of conduct. *See Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1411 (9th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991); *cf. Fjelstad,* 762 F.2d at 1343. This conduct was willful.

■ In addition to willfulness, when a court order is violated, as in this case, a district court that decides to impose sanctions must consider the risk of prejudice to the defendants and the availability of less drastic sanctions. *Adriana,* 913 F.2d at 1412. Here, both factors favor the district court's sanction.

Noble and Moorgate's willful refusal to comply with the court's order severely prejudiced the government's ability to make its case. *See id.* (finding that "the repeated failure of [the corporate party] to appear at scheduled depositions ... constitute[d] an interference with the rightful decision of the case"); *see also Hyde & Drath v. Baker,* 24 F.3d 1162, 1167 (9th Cir.1994) (finding that failure of corporation to appear at depositions prejudiced opposing party).

The district court also considered lesser sanctions. On November 10, 1992, the magistrate judge imposed a sanction of $500 on Noble and Moorgate. Although apparently the court never warned Noble and Moorgate that their continued intransigence would result in the harsh sanction eventually imposed, a warning was not necessary in this case. First, Noble and Moorgate could not have been surprised by the severity of the sanction. *See Adriana,* 913 F.2d at 1413 (no explicit warning necessary when harsh sanction of dismissal should not have surprised party who willfully violated court's order); *Malone v. U.S. Postal Serv.,* 833 F.2d 128, 133 (9th Cir.1987), *cert. denied,* 488 U.S. 819, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988) (same). When seeking the original monetary sanction and order to compel, the CFTC explicitly expressed its intention to seek more severe sanctions, including default judgment, if No-

ble and Moorgate failed to comply with the court's discovery order.

Second, the circumstances surrounding the sanction were egregious. *See id.* at 132–33. Not only did Noble and Moorgate violate a court order and fail to pay the earlier $500 sanction, they did not seek a protective order even though they had six months to do so. The record also indicates this was not the first time these defendants engaged in dilatory tactics.

We conclude the district court did not abuse its discretion in imposing its Rule 37(b)(2) sanction ordering that the allegations of the complaint be taken as established for the purposes of the action.

■ Noble and Moorgate argue that even taking all of the allegations of the complaint as true, they did not violate sections 4(a) or 4b of the Act because, they contend, the Forward Delivery Program contracts they sold were not "futures contracts" regulated by the Act. We disagree.

Under section 2(a)(1)(A) of the Act, the CFTC has exclusive jurisdiction over "accounts, agreements ... and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market." 7 U.S.C. § 2. The Act requires that these "futures contracts" be offered and sold on commission-designated boards of trade, or they are deemed illegal "off-exchange" contracts. *In re Bybee,* 945 F.2d 309, 312 (9th Cir.1991) (citing 7 U.S.C. § 6(a)).

A futures contract enables an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and the date delivery is due— without having to take physical delivery of the commodity. *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 579–80 (9th Cir. 1982). A futures contract provides that a specific amount of the commodity will be "delivered" to the buyer at a specified date

(trade date) at an agreed-upon price. If the buyer does not want to take delivery of the commodity on the trade date, he enters an "off setting transaction" to sell the same amount of the commodity. *Id.* The investor's profit or loss depends upon the difference between the amount the investor contracted to pay for the commodity and what he gets for it when he sells it.

Excluded from the definition of futures contracts, and thus from CFTC jurisdiction, are "cash forward contracts," which are "any sale of any cash commodity for deferred shipment or delivery."[4] 7 U.S.C. § 2. This "narrow" exclusion is predicated on both parties contemplating and intending future delivery of the actual commodity when immediate delivery would be commercially impracticable.[5] *Co Petro,* 680 F.2d at 578; *see also In re Bybee,* 945 F.2d at 313 (citing *In re Stovall,* [1977–1980 Transfer Binder], Comm. Fut.L.Rep. (CCH) ¶ 20,941, at 23,777–778).

■ Noble contends the Forward Delivery Program contracts it sold were cash forward contracts, not futures contracts, and thus were exempt from CFTC jurisdiction. We disagree. The cash forward contract exclusion is "unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Co Petro,* 680 F.2d at 579.

It is undisputed that among the vast number of purchasers of metals under the Forward Delivery Program offered by Noble and Moorgate, only a handful contemplated actual delivery. Noble and Moorgate contend that they satisfied the "delivery" requirement nonetheless, because the contracts required the buyer to "take or make delivery of the merchandise contracted." According to Noble and Moorgate, they satisfied this requirement by transferring, *i.e.,* "delivering," title to the metals to the investor; the metals

---

**4.** The terms "futures contracts" and "cash forward contracts" are terms of art which do not appear in the Act.

**5.** Congress created the cash forward contract exclusion for farmers who wanted to sell part of the next season's harvest at a set price to a grain elevator or miller. *Co Petro,* 680 F.2d at 577. In such a transaction, both parties are guaranteed a price, but delivery is delayed until the miller or elevator has the capacity to process the wheat. *Id.*

may have been held by the third-party depository, but the investor owned the metals, as reflected by his documents of title, and thus he had taken delivery.

■ We reject this argument. To take advantage of the cash forward contract exclusion under the Act, the delivery requirement cannot be satisfied by the simple device of a transfer of title. As we said in *Co Petro*, "a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." *Co Petro*, 680 F.2d at 578. If this were not so, the cash forward contract exception would quickly swallow the futures contract rule.

"[S]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA]." *American Metal Exch. Corp.*, 693 F.Supp. 168, 192 (D.N.J.1988) (quoting *CFTC v. Morgan, Harris, & Scott Ltd.*, 484 F.Supp. 669, 675 (S.D.N.Y.1979)). Here, there was no legitimate expectation that Noble's and Moorgate's customers would take actual delivery of the metal they bought. The Forward Delivery Program contracts, therefore, were futures contracts subject to the Commission's jurisdiction, and when Noble and Moorgate sold them in off-exchange transactions they violated section 4(a) of the Act.

The district court did not err in granting summary judgment against Noble and Moorgate on this count. Nor did it err in granting summary judgment against them on the section 4b count. Taking the allegations of the complaint as established, Noble and Moorgate's sales of the Forward Delivery Program contracts were fraudulent within the meaning of section 4b.

2. Summary Judgement Against Schulze and Portaro

As we have previously stated, Schulze's individual arguments on appeal are meritless. We have also rejected Noble's and Moorgate's arguments, in which Schulze joins. We conclude, therefore, that the district court did not err in granting summary judg-

ment against Schulze on the sections 4(a) and 4b counts.

■ Portaro, who was the former sales manager of Moorgate, argues summary judgment should not have been entered against him on the CFTC's allegations that he violated sections 4(a) and 4b of the Act, because there is at least a genuine issue of material fact whether *scienter* was established against him.

That section 4(a) does not require proof of *scienter* has been settled, at least implicitly, by our court. *See Co Petro*, 680 F.2d at 582. A review of the statutory language confirms this conclusion. Section 4(a) provides:

It shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business ... for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery ... unless—

(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commission as a "contract market" for such commodity....

7 U.S.C. § 6(a) (1988). Section 4(a) makes no mention of *scienter*. *Compare* 7 U.S.C. § 6b (1988).

Section 13c further supports this reading. Section 13c provides in pertinent part:

(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules[,] regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders

may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a) (1988).

In contrast to the provisions for aider and abetter liability, section 13c does not require *scienter* when, as here, the defendant directly commits the violation. Furthermore, even if Portaro's actions merely constituted aiding and abetting, his willful violation of the Act is established indisputably by the record in this case. Portaro was the sales manager for Moorgate. He hired the salespeople who sold the Forward Delivery Program contracts, was responsible for their compliance and training, and supervised sales of the contracts to customers. He also offered and sold Forward Delivery Program contracts to members of the general public.

We can accept as true Portaro's contention that he relied in good faith on the opinion of counsel that the Forward Delivery Program contracts complied with the Act and he did not intend to do anything wrong. This is irrelevant in a section 4(a) case, because *scienter* is not an element of the offense.[6] It is enough that Portaro willfully did those things proscribed by the Act. *See Lawrence v. CFTC,* 759 F.2d 767, 773 (9th Cir.1985) (finding willfulness established under the CEA "[i]f a person (1) intentionally does an act which is prohibited,—irrespective of evil motive or reliance on erroneous advice, or (2) acts with careless disregard of statutory requirements").

With regard to the section 4b claim, however, *scienter* is an element.[7] The Commission must show Portaro intentionally violated the Act or acted with "careless disregard" of whether his actions violated the Act. *Lawrence,* 759 F.2d at 773; *CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979). "Mere negligence, mistake, or inadvertence fails to meet Section 4b's scienter requirement." *Wasnick v. Refco, Inc.,* 911 F.2d 345, 348 (9th Cir.1990) (citing *Drexel, Burnham Lambert, Inc. v. CFTC,* 850 F.2d 742, 748 (D.C.Cir. 1988)).

Here there is a genuine issue of material fact whether Portaro acted with the requisite *scienter* to establish fraud. The record is replete with references to his efforts to run a legitimate sales operation. For example, various salespeople attested that Portaro forbade them from misrepresenting any aspect of the Forward Delivery Program to their customers. Furthermore, there is no direct evidence that he intended to defraud anyone.

Because there is a genuine dispute of material fact whether Portaro acted with the requisite *scienter* for a violation of section 4b of the Act, we reverse the district court's grant of summary judgment against him on that count.

## B. The Asset Freeze

In the initial phases of the litigation, the court froze the assets of each of the defendants, first as part of the temporary

---

**6.** Nonetheless, "good faith reliance on the advice of counsel is ... a factor in determining the propriety of injunctive relief." *Securities and Exchange Commission v. Steadman,* 967 F.2d 636, 648 (D.C.Cir.1992); *cf. also Aaron v. SEC,* 446 U.S. 680, 701, 100 S.Ct. 1945, 1958, 64 L.Ed.2d 611 (1980) (in applying provisions of the Securities Act of 1933 which do not require proof of *scienter,* "a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief"). The district court took this factor into account by declining to issue a permanent injunction against Portaro.

**7.** Section 4b provides in pertinent part:
It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person is such contract for future delivery is or may be used for (a) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—
(A) to cheat or defraud or attempt to cheat or defraud such other person.
7 U.S.C. § 6b(A).

restraining order, and later as part of the preliminary injunction.[8] Shortly after the complaint was filed, counsel for Noble and Moorgate applied for payment of their attorney fees from the frozen assets. The district court denied this application. As a result, Noble and Moorgate were precluded from using the frozen assets to pay their attorney fees throughout the litigation.

■ A district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets. *See FSLIC v. Ferm,* 909 F.2d 372, 375 (9th Cir.1990) (approving limitation on attorney fees); *see also FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir.1989) (observing that "[c]ourts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees"); *cf. CFTC v. Co Petro Mktg. Group, Inc.,* 700 F.2d 1279, 1284 (9th Cir.1983) (*Co Petro II*) (requiring counsel to return fee received after defendants' assets were frozen for violating futures trading regulations).

■ According to the record, the frozen assets fell far short of the amount needed to compensate Noble's and Moorgate's customers. This was reason enough in the circumstances of this case for the district court, in the exercise of its discretion, to deny the attorney fee application. *See World Wide Factors,* 882 F.2d at 348 (approving limitation on attorney fees "out of concern for preserving funds for ultimate distribution to defrauded customers") (citing *FSLIC v. Dixon,* 835 F.2d 554, 564–65 (5th Cir.1987)); *accord CFTC v. Morse,* 762 F.2d 60, 63 (8th Cir.1985). We do not, however, intimate that attorney fee applications may always be denied where the assets are insufficient to cover the claims. Discretion must be exercised by the district court in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made. *Cf. Dixon,* 835 F.2d at 565.

## CONCLUSION

The district court's grant of summary judgment against all defendants for violating section 4(a) of the Act is affirmed. The district court's grant of summary judgment is also affirmed against all defendants except Portaro for violating section 4b of the Act. The district court's summary judgment against Portaro for violating section 4b of the Act is reversed. The district court's denial of the application for the payment of attorney fees from frozen assets and the district court's permanent injunction are affirmed.

AFFIRMED in part, REVERSED in part and REMANDED.

REINHARDT, Circuit Judge, dissenting in part:

I would hold that the sanctions imposed upon Noble and Moorgate for discovery violation were excessive and unlawful. In my opinion, ordering that the plaintiff's complaint be taken as established as a Rule 37(b)(2) sanction was an abuse of discretion. Moreover, I conclude that the district court erred in failing to provide adequate warning to the defendants and failing to consider lesser alternative sanctions. On a separate point, I believe that the order denying Noble and Moorgate the opportunity to use any of their assets for purposes of attorneys fees was erroneous.

In *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Construction Co.,* we identified "orders taking the plaintiff's allegations as established and awarding judgment to the plaintiff on that basis" and "dismissal of the plaintiff's action" as the most severe penalties that can be imposed against a defendant and plaintiff, respectively. *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 603 n. 5 (9th Cir.1988). Entering a default judgment against a defendant as a discovery sanction precludes him from defending against the allegations raised against him. This court has refrained from imposing this very severe penalty in all but

---

**8.** The court allowed the individual defendants to expend funds "for ordinary, reasonable, and necessary living expenses," from their frozen assets.

Neither Schulze nor Portaro appeal the asset freeze.

the most extreme cases. *Id.* at 603; *Wanderer v. Johnston*, 910 F.2d 652, 653 (9th Cir.1990) (finding "[t]he severe sanction of default was justified by the defendants' repeated and inexcusable obstruction of every type of discovery attempted by the plaintiffs"). While I do not condone Noble and Moorgate's conduct during the course of pretrial proceedings, the penalty should fit their transgression. Noble and Moorgate's conduct was not so extreme as to warrant the ultimate penalty.

Noble and Moorgate's conduct—failing to provide a representative who did not invoke the Fifth Amendment privilege—involved none of the extreme behavior for which we have affirmed default judgments against other defendants. *See, e.g., Wanderer v. Johnston*, 910 F.2d 652, 653 (9th Cir.1990) (affirming default judgment against defendants who "exhibited complete indifference to [the court's] warnings, the orders of th[e] court and their discovery obligations, thereby thwarting plaintiffs' every attempt to secure basic, legitimate discovery"); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir.1987) (affirming default judgment entered against defendant for committing perjury during depositions and filing false pleadings with the court); *Shearson Loeb Rhoades, Inc. v. Quinard*, 751 F.2d 1102, 1103 (9th Cir.1985) (affirming default judgment entered against defendant for "willful and deliberate disobedience of a discovery order, willful concealment of evidence, and attempted fabrication of false evidence").

"Even assuming that the conduct of [Noble and Moorgate] meets the extreme circumstances and willfulness requirements," a review of the five *Wanderer* factors demonstrates that "the sanction imposed by the district court was not in the 'acceptable range'." *Kahaluu*, 857 F.2d at 603 (citing *Malone v. United States Postal Service*, 833 F.2d 128, 130 (9th Cir.1987)). We have reserved the default judgment sanction for defendants who made discovery of any type virtually impossible, particularly defendants who failed to produce documents. Relying upon our holdings in *Hyde & Drath v. Baker*, 24 F.3d 1162 (9th Cir.1994), and *Adriana v. Thoeren*, 913 F.2d 1406 (9th Cir.1990), *cert. denied, Lewis & Co. v. Thoeren*, 498 U.S. 1109, 111 S.Ct. 1019, 112 L.Ed.2d 1100 (1991), the majority suggests that the failure to appear for scheduled depositions is sufficient reason to find prejudice. However, we found prejudice in *Hyde* because

> the ... case resemble[d] *Adriana International Corp. v. Thoeren*, where "the repeated failure of [plaintiffs] to appear at scheduled depositions *compounded by their continuing refusal to comply with court-ordered production of documents* constitute[d] an interference with the rightful decision of the case."

*Hyde*, 24 F.3d at 1167 (citations omitted) (emphasis added). Noble and Moorgate did not engage in comparable conduct. Their failure to appear at depositions was not compounded by a failure to produce documents. "Delay alone has been held to be insufficient prejudice," whereas "[f]ailure to produce documents as ordered ... is considered sufficient prejudice." *Adriana*, 913 F.2d at 1412.

In addition, as we explained in *Kahaluu*, the district court abuses its discretion if it fails to consider less drastic alternative sanctions and to warn the defendants of the possible consequences, except in "exceptional" cases or cases involving "egregious circumstances." *Kahaluu*, 857 F.2d at 604, 605. We have said expressly that in most cases warranting the imposition of serious sanctions, "the district court must consider less severe alternatives and discuss them if it elects to dismiss." *Id.* Because, this is not the type of unusual case that justifies our abandoning our ordinary principles, the district court was obliged to give adequate warning to Noble and Moorgate and to consider lesser sanctions before precluding the defendants from opposing the plaintiff's claim.

"In some cases, the fact that the district court actually implemented alternative sanctions prior to dismissal may be enough to satisfy the 'consideration of alternatives' requirement." *Id.* This is not such a case. In *Kahaluu* we found a $300 sanction imposed

against defendants for failing to comply with a document production request was insufficient to fulfill the district court obligation to consider alternatives. *Id.* Likewise, the $500 sanction imposed against Noble and Moorgate for failing to provide a representative who would not invoke Fifth amendment privilege at deposition does not satisfy that requirement.

> In short, the record indicates no consideration by the district court of the adequacy of lesser sanctions and no warning to the defendants that judgment might be awarded for [the Commission].

*Kahaluu,* 857 F.2d at 605. By precluding Noble and Moorgate from defending against the Commission's claim, "the district court in effect deprived them of all of their rights as to [this] action." *Id.* "This harsh a penalty was not warranted." *Id.*

## Attorney Fees

District courts do have discretion to regulate the payment of attorneys fees from assets that are frozen pending trial and to forbid the payment of some fees out of those assets. However, we have *never* previously held, as the majority appears to believe we have, that a flat prohibition against the payment of all attorneys fees, including those essential to provide a defense, is within a district court's discretion. To the contrary, in previous cases we have told the district courts to establish rules governing the use of frozen assets for attorneys fees and have described how and under what circumstances a district court may go about *limiting* access

to frozen funds for payment of attorneys fees. *See, e.g. FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 348 (9th Cir.1989). Moreover, as one of the cases we have approved states specifically, district courts should establish procedures that will *permit* the payment of reasonable attorneys fees. *FSLIC v. Dixon,* 835 F.2d 554, 565 (5th Cir.1987).

The cases cited by the majority simply do not support its unprecedented holding. The district court in *FSLIC v. Ferm,* 909 F.2d 372, 375 (9th Cir.1990), did *not* institute a flat prohibition against the payment of any attorneys fees out of frozen assets. Instead, that court only required that attorneys fees be monitored *in camera* to ensure their reasonableness. Likewise, in *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347, 346 (9th Cir.1989), we did *not* hold that a district court could forbid payment of all attorneys fees. Our holding in *World Wide Factors* was only that it is within a district court's discretion to place a limit on the hourly rate paid to the defendants' attorneys from frozen funds. *Id.* at 348. Finally, *CFTC v. Co Petro Mktg. Group, Inc.,* 700 F.2d 1279, 1284 (9th Cir.1983) (*Co Petro II*) has nothing to so with the district court's authority to freeze assets pending trial or the right of a party to use its assets for attorneys fees prior to or during the course of the trial. In *Co Petro II,* counsel received funds from the defendants *after* their clients had lost the trial on the merits and *after* they had been prohibited by a *permanent injunction* from using those funds for any purpose.[1] Likewise, the

---

1. The majority's reliance on this case is understandable because our opinion appears at times to confuse the terms preliminary and permanent injunctions. In *Co Petro (II)*, the law firm representing Co Petro appealed a district court order finding that it had violated a *permanent injunction* against the transfer of any of Co Petro's assets and ordering the return of $60,000 that the law firm had received the day after the district court issued its ruling on the merits against Co Petro. *Co Petro (II)* plainly and accurately describes the nature of the appeal and the issue before the court as follows:

> Appellant Loo, Merideth & McMillan appeals from a district court order declaring that appellant had violated a *permanent injunction* issued by the district court against any transfer

of the assets of Co Petro Marketing Group, Inc. ("Co Petro"). The district court ordered appellant to return $60,000 it had received from Co Petro.
> Appellant contends (1) that the district court did not have jurisdiction to issue the order, (2) that the district court proceeding was automatically stayed under section 362 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 362 (Supp. IV 1980), and (3) *that receipt and deposit of the $60,000 by Appellant did not violate the permanent injunction.*

*Co Petro II,* 700 F.2d at 1280 (emphasis added). The confusion stems from the fact that the hearing for the preliminary injunction was consolidated with the hearing on the merits. For this reason, apparently, our opinion sometimes refers

last case cited by the majority opinion deals with a prohibition of the payment of attorneys *after the defendant lost on the* merits. *CFTC v. Morse,* 762 F.2d 60, 61 (8th Cir. 1985) ("appeal from entry of a permanent injunction").

In *World Wide Factors,* cited by the majority, we did say in dictum:

> Courts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees. *See Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.,* 700 F.2d 1279 (9th Cir.1983). Any doubt as to the constitutionality of freezing assets and precluding entirely their use for payment of attorney fees in circumstances even more extreme than this case have now been resolved by the Supreme Court's recent decision in *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) and *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

*World Wide Factors,* 882 F.2d at 347 (parenthetical explanation omitted). While it is correct that "[a]ppellate court decisions ... have consistently permitted district courts *to limit or to review* the amount payable to attorneys from frozen assets before a final judgment on the merits has been reached," *Ferm,* 909 F.2d at 374, district courts have only been permitted to *forbid* payment of all attorney fees in one particular class of cases. In support of our overbroad dictum in *World Wide Factors,* we properly cited the two recent Supreme Court cases that *do permit* courts to totally forbid the payment of attorneys fees from disputed funds. Both cases involve criminal defendants and forfeiture statutes.

In *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) and *United States v. Monsanto,* 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989), the Supreme Court held that criminal defendants have no Sixth Amendment right to pay their attorneys fees with funds that are subject to being forfeited. These cases do not purport to determine the extent of the district court's discretion over frozen assets under other circumstances or in general. Nor is their rationale applicable to proceedings of the type before us. The Supreme Court cases set forth the reasons why *criminal* defendants do not have a constitutional right to pay their attorneys fees from forfeited or forfeitable funds. They do not explain why a defendant in a civil proceeding whose assets are not subject to forfeiture should be prohibited from using those assets to defend himself. The considerations affecting the two questions are obviously quite different.

This court has never before approved a total prohibition against the use of frozen assets for attorneys fees. Certainly, we have never done so as part of ancillary relief under section 6c of the Commodities Exchange Act, or in connection with any other civil case. The majority offers no explanation for why we should do so now. One of the cases relied on by the majority cites the Fifth Circuit's decision in *FSLIC v. Dixon,* 835 F.2d 554, 565 (5th Cir.1987). That case, however, far from forbidding the payment of attorneys fees out of frozen assets, held that "allowance must be made to permit each defendant to pay reasonable attorneys' fees if he is able to show that he cannot [otherwise] pay them." Granted, we might conclude that the burden is on the defendants to show they will only be able to hire an attorney if assets subject to the freeze order are released. *Dixon,* 835 F.2d at 565. Nevertheless, at the very least, the district court in this case was obligated to assess whether or not the defendants needed to use the frozen assets to pay reasonable attorneys fees rather than categorically barring them from using any of

---

to the permanent injunction against "transferring or dealing in any manner whatsoever with the assets of Co Petro" as a preliminary injunction. In any event, in *Co Petro II,* there was no question raised on appeal with respect to whether the district court had the discretion to issue an order prohibiting payment of any or all attorneys

fees. The only issues raised were whether the district court was deprived of jurisdiction to proceed by virtue of the Bankruptcy Act, whether the proceedings were automatically stayed, and whether a *violation* of the injunction had occurred.

their assets without even making an appropriate inquiry.

The purpose behind freezing a defendants' assets is "to ensure that such assets are not squandered by one party to the potential detriment of another," *Ferm*, 909 F.2d at 374, not to prevent defendants from mounting a defense at all.

If, out of concern for preserving funds for ultimate distribution to defrauded customers, the district court wishes to limit the amount by which the frozen funds may be invaded for payment of attorney fees, it should set a maximum total sum which may be withdrawn or it should establish the minimum size to which the otherwise frozen assets may be reduced based upon appropriate findings.

*World Wide Factors*, 882 F.2d at 348. The majority's concern that Noble and Moorgate's frozen assets fell short of the amount needed to compensate their customers is commendable. However, "this suit was brought to establish the defendants' wrongdoing; the court cannot assume the wrongdoing before judgment in order to remove the defendants' ability to defend themselves." *FSLIC v. Dixon*, 835 F.2d at 565. Some kind of allowance should have been made to permit Noble and Moorgate to pay reasonable attorney's fees associated with their defense.

